**In re Billy Ray ETHRIDGE and Mable Ann Ethridge, Debtors in Chapter 11.**

**FARMERS STATE BANK, Plaintiff,**

v.

**Billy Ray ETHRIDGE and Mable Ann Ethridge, Defendants-Debtors.**

Bankruptcy No. 86–10252–L.
Adv. No. 86–0211.

United States Bankruptcy Court,
W.D. Tennessee, E.D.

Dec. 11, 1986.

Albert B. Merkel, Jackson, Tenn., for debtors.

R. Bradley Sigler, Jackson, Tenn., for Farmers State Bank.

Gary A. Vanasek, Jackson, Tenn., for U.S.

MEMORANDUM OPINION AND ORDER RE: COMPLAINT OF FARMERS STATE BANK SEEKING DECLARATORY JUDGMENT AS TO PRIORITY OF HOG SALE FUNDS AND CROSS–COMPLAINT OF INTERVENOR, UNITED STATES OF AMERICA, TO DETERMINE THE NATURE, EXTENT, AND PRIORITY OF LIENS

WILLIAM B. LEFFLER, Bankruptcy Judge.

At issue is whether Farmers State Bank (the Bank) possesses a security interest in the proceeds realized from the sale of 110 hogs formerly belonging to the Debtors by virtue of "present and future debt clauses" contained in security agreements executed by the parties.

This is a case of first impression for this Court. The following constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

Billy and Mable Ethridge filed a Petition for Relief under Chapter 11 of the Bankruptcy Code on March 3, 1986. Prior to that time they were in the business of "trucking and farming." In that capacity, Mr. Ethridge obtained several loans from Farmers State Bank and from the Farmers Home Administration (F.H.A.). It is the Bank's contention that security agreements executed by Mr. Ethridge in connection with these loans entitle it to proceeds from the sale of 110 feeder pigs which the Farmers Home Administration claims it has a security interest in.

The record reflects that, with respect to the Bank's claim, three promissory notes and security agreements are at issue. The first, executed on May 31, 1985 by Mr. Ethridge, grants the Bank a security interest in a 1980 Hay Baler and 4–Row MF Planter in exchange for a $4,225.40 principal amount loan. The second, executed on September 30, 1985, grants the Bank a security interest in a 1977 Intl. Truck Transtar; a 1975 Intl. Transtar Trailer; a 1982 Lufkin 45 ft. Trailer Flat Bed; two Certificates of Deposit, plus increases, in the amounts of $6,821.92 and $5,000.00; a Chevrolet 2½ Ton Truck, and a Flat Bed and Trailer 45 ft. in exchange for a loan in the principal amount of $52,650.06. The third, executed on October 25, 1985, grants the Bank a security interest in 300 feeder pigs and a second lien on a 1975 International Truck in exchange for a loan in the principal amount of $10,581.24.

All three security agreements contain the following statements:

Security: I am giving a security interest in

(1) The goods or property being purchased.

(2) Collateral securing other loans with you may also secure this loan.

(3) My deposit accounts and other rights to the payment of money from you.

Preceding each of the above sentences are boxes which are apparently to be checked to indicate whether the security described therein is granted by the particular security agreement. With respect to the security agreements at issue here, the first one, dated May 31, 1985, contains an "X" in the box preceding the first sentence only, i.e. to indicate a security interest only in the goods or property being purchased while the second and third agreements contain "X's" preceding each sentence.

In addition, each agreement contains the clauses set forth below on their reverse sides.

*Other security*—I agree that any present or future agreement securing any other debt I owe you will also secure this debt....

*Secured Obligations*—This security interest will secure the payment of the note total.... It will also secure ... any other debt I owe you now or hereafter. This security interest will survive even if there are no debts owed to you until this security interest is formally discharged in writing.

The above described clauses contained in the security agreements along with the UCC–1 filed on the pigs which covers "proceeds" form the basis for the Bank's claim to the proceeds at issue.

According to the statements of counsel and Mr. Ethridge's testimony, the collateral for the first loan has been surrendered to the Bank leaving a deficiency balance due on the note, the second loan is undersecured, and the third loan has been repaid in the amount of $10,581.24 which was realized from the sale of 300 feeder pigs.

The FHA has intervened in this proceeding with an objection to the Bank's claim based upon security agreements executed by Mr. Ethridge in its favor. These agreements reflect the following transactions:

1) A $100,000.00 loan obtained on September 7, 1982 secured by crops, equipment, and hogs;

2) An $89,910.00 loan obtained on May 23, 1983 secured by crops, equipment, and hogs;

3) A $126,244.11 loan obtained on May 11, 1984 secured by crops, equipment, and hogs; and

4) A $129,704.00 loan obtained on June 7, 1985 secured by crops, equipment, and hogs.

Moreover, each of these security agreements grants the FHA a security interest in "all livestock ... now owned or hereafter acquired."

It is the contention of the FHA and the Debtors that these agreements and the June 7, 1985 security agreement in particular grant the FHA a security interest in the 110 hogs and their proceeds at issue here. According to Mr. Ethridge, this is because these hogs were purchased with funds loaned by the FHA rather than funds

loaned by the Bank. He further testified that the hogs were distinguishable because of their ages and sizes and that none of the hogs from either group were bred.

Each of the security agreements in question, both in favor of the Bank and the FHA, are represented by duly filed UCC–1 statements reflecting the respective lender's security interests. Therefore, as indicated above, the question becomes which of these creditors is entitled to the proceeds from the sale of 110 hogs by the Debtors.

The validity and priorities among conflicting security interests are governed in Tennessee by the Uniform Commercial Code, T.C.A. § 47–9–101 et seq. Pursuant to these statutes, a security interest must "attach" in order to be enforceable. "Attachment" requires that the debtors have rights in the collateral constituting security, that the creditor give value for the security interest, and, as is pertinent here, that the "debtors sign a security agreement which contains a description of the collateral." T.C.A. § 47–9–203. A "description" is considered sufficient if it "reasonably identifies what is described." T.C.A. § 47–9–110.

The specific "priority" statute is T.C.A. § 47–9–312 which provides in pertinent part:

(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives the collateral or within twenty (20) days thereafter.

(5) In all cases not governed by other rules stated in this section,.... priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection....

Purchase money security interests are defined at T.C.A. § 47–9–107 as a security interest (1) taken or retained by the seller of the collateral to secure its price or (2) taken or retained by a person who by making advances ... gives value to enable the debtors to acquire rights in or the use of collateral if such value is so used.

Upon application of these rules to the present facts, it is clear that the Bank holds a purchase money security interest in the 300 feeder pigs and their proceeds by virtue of the language contained in the October 25, 1985 security agreement. It is equally clear from the provisions set forth above which describe the collateral given as security for each of the Bank's notes that there are no provisions which "reasonably identify" any other pigs as collateral as required by T.C.A. § 47–9–110. There is simply no mention of a security interest being taken in any livestock other than the 300 feeder pigs. Nonetheless, the Bank contends that the "cross collateralization" clauses set forth above and contained in its agreements with the Debtors entitle it to the present proceeds.

Under Tennessee law, cross-collaterization or "present and future debt clauses" are recognized as valid and enforceable. *Johnson v. Midland Bank and Trust* 715 S.W.2d 607, 610 (M.D.Tenn.1986) citing *McGavock v. Deery* 41 Tenn.(1Cold.) 265 (1860), *Murdock Acceptance Corp. v. Jones* 50 Tenn.App. 431, 362 S.W.2d 266 (M.D.Tenn.1961), and *Wright v. Lincoln County Bank* 62 Tenn.App. 560, 465 S.W.2d 877 (M.D.Tenn.1970). The *Johnson* case and those cited therein involved Deeds of Trust which contained provisions whereby the real estate securing specific loans was to also secure "any present or future debt owing." The Court determined that by such language, the parties intended for the Deeds of Trust to secure "any" indebtedness including that which was originally unsecured.

The same determination may be made in the case at bar. However, in accordance with the *Johnson* case, supra, and T.C.A. § 47–9–203 and § 47–9–110, this determination only recognizes the Bank's right to look to the collateral described in the security agreements as security for the Debtors' total indebtedness. Moreover, by the

terms of the agreements themselves, only the security interests granted are to secure the Bank's present or future indebtedness. This Court cannot extend the Bank's security interests beyond those described in the agreements.

In light of the above determination and the FHA's prior perfected security interest in the Debtors' "livestock," it is apparent that the FHA is entitled to the proceeds at issue.

For the above reasons, it is THERE-FORE HEREBY ORDERED THAT

The claim of the Bank to priority of the hog sale funds is denied; and

The FHA is entitled to said funds by virtue of its prior perfected security interest.